Dean G. Rallis Jr. (# 94266)
drallis@afrct.com
Matthew D. Pham (# 287704)
mpham@afrct.com
ANGLIN, FLEWELLING, RASMUSSEN,
CAMPBELL & TRYTTEN LLP
301 N. Lake Ave., Suite 1100
Pasadena, California 91101-4158
Tel: (626) 535-1900 | Fax: (626) 577-7764

Attorneys for WELLS FARGO BANK, N.A., as
successor by merger with Wells Fargo Bank
Southwest, N.A., f/k/a Wachovia Mortgage,
FSB, f/k/a/ World Savings Bank, FSB

**UNITED STATES BANKRUPTCY COURT**

**NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE DIVISION**

| | |
|---|---|
| In re | Case No.: 15-53562-SLJ |
| LAURA A. GENS, | Chapter 11 |
| Debtor. | **WELLS FARGO'S OBJECTION TO APPROVAL OF THE DISCLOSURE STATEMENT ASPECT OF DEBTOR'S COMBINED PLAN OF REORGANIZATION AND DISCLOSURE STATEMENT DATED NOV. 4, 2016** |
| | Date: January 5, 2017<br>Time: 1:30 p.m.<br>Crtrm: 3099<br>280 South First Street<br>San Jose, California 95113 |

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

*Anglin Flewelling Rasmussen Campbell & Trytten LLP*

# **TABLE OF CONTENTS**

Page

1. INTRODUCTORY STATEMENT. .................................................................... 1

2. ARGUMENT ................................................................................................... 2

   A. Adequacy of a Disclosure Statement ................................................... 2

   B. The Disclosure Statement Lacks Adequate Information that Will Allow Creditors to Evaluate the Plan's Feasibility. ...................................... 3

      i. Inadequate Information Regarding the Debtor's Business Income. ........... 4

      ii. Inadequate Information Regarding the Nondebtor Spouse's Income. ............................................................................... 5

      iii. Inadequate Information Regarding the Debtor's Children's Financial Condition. ...................................................... 7

   C. The Disclosure Statement Lacks Adequate Information Regarding the Treatment of Wells Fargo's Claim. ................................................... 8

   D. The Disclosure Statement Describes a Patently Unconfirmable Plan by Failing to Include Interest on Wells Fargo's Prepetition Arrears. ......................... 9

   E. In the Alternative, Wells Fargo Requests a Continuance of the Hearing. ............ 12

3. CONCLUSION.................................................................................................. 12

ANGLIN FLEWELLING RASMUSSEN CAMPBELL & TRYTTEN LLP

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

Acequia, Inc. v. Clinton (In re Acequia, Inc.),
787 F.2d 1352 (9th Cir. 1986)..................................................................................10

In re Applegate Prop., Ltd.,
133 B.R. 827 (Bankr. W.D. Tex. 1991)......................................................................3

In re Atlanta W. VI,
91 B.R. 620 (Bankr. N.D. Ga. 1988).........................................................................10

In re Beyond.com Corp.,
289 B.R. 138 (Bankr. N.D. Cal. 2003) ......................................................................9

Duff v. U.S. Tr. (In re Cal. Fid., Inc.),
198 B.R. 567 (B.A.P. 9th Cir. 1996) .........................................................................2

In re E. Me. Electric Coop., Inc.,
125 B.R. 329 (Bankr. D. Me. 1991) ..........................................................................9

In re Main St. AC, Inc.,
234 B.R. 771 (Bankr. N.D. Cal. 1999) .....................................................................10

Menard-Sanford v. Mabey (In re A.H. Robins Co.),
880 F.2d 694 (4th Cir. 1989).....................................................................................2

In re Metrocraft Pub. Servs. Inc.,
39 B.R. 567 (Bankr. N.D. Ga. 1984) .........................................................................3

Tex. Extrusion Corp. v. Lockheed Corp. (In re Tex. Extrusion Corp.),
844 F.2d 1142 (5th Cir. 1988)...................................................................................2

**FEDERAL STATUTES**

11 U.S.C. § 506(b)................................................................................................... 10

11 U.S.C. § 1122 ..................................................................................................... 10

11 U.S.C. § 1123 ..................................................................................................... 10

11 U.S.C. § 1123(d)............................................................................................10, 12

11 U.S.C. § 1125 ..............................................................................................2, 9, 12

11 U.S.C. § 1125(a)(1) ..............................................................................................2

ANGLIN FLEWELLING RASMUSSEN CAMPBELL & TRYTTEN LLP

95457/000267/01624318-4

11 U.S.C. § 1125(b) ............................................................................................... 2

11 U.S.C. § 1129(a)(1) .....................................................................................10, 12

11 U.S.C. § 1129(a)(7) ............................................................................................ 10

11 U.S.C. § 1129(b) ........................................................................................... 9, 10

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ANGLIN FLEWELLING RASMUSSEN CAMPBELL & TRYTTEN LLP

95491/000267/01524318-4

ANGLIN FLEWELLING RASMUSSEN CAMPBELL & TRYTTEN LLP

1 **TO THE HONORABLE STEPHEN L. JOHNSON, UNITED STATES BANKRUPTCY**

2 **JUDGE; OFFICE OF THE UNITED STATES TRUSTEE; THE DEBTOR AND HER**

3 **COUNSEL OF RECORD; AND ALL PARTIES REQUESTING SPECIAL NOTICE:**

4     Wells Fargo Bank, N.A., as successor by merger with Wells Fargo Bank Southwest,

5 N.A., formerly known as Wachovia Mortgage, FSB, which was formerly known as World

6 Savings Bank, FSB ("Wells Fargo"), secured creditor of Laura A. Gens, the debtor and debtor in

7 possession in the above-captioned chapter 11 case (the "Debtor"), hereby submits its objection

8 (the "Objection") to the approval of the disclosure statement aspect (the "Disclosure Statement")

9 of the *Combined Plan of Reorganization and Disclosure Statement Dated Nov. 4, 2016* (the

10 "Plan"), filed by the Debtor.

## 1.   INTRODUCTORY STATEMENT.

12     The Debtor has filed her new plan that looks more like a last-ditch effort to stave off an

13 inevitable case dismissal or conversion than a legitimate proposal of reorganization. While the

14 Plan and Disclosure Statement present a plan that is drastically more realistic than what was

15 presented in the Debtor's previously filed plans (e.g., reducing her spouse's monthly contribution

16 from $100,000 to $10,000), the Plan and Disclosure Statement still contain many of the same

17 deficiencies that have plagued her reorganization efforts before—namely, the reliability and

18 legitimacy of the Debtor's own income or that of her family members allocated for the proposed

19 plan payments. Given that the Disclosure Statement provides essentially no reliable information

20 about these sources of income to enable creditors to make an informed judgment about the

21 feasibility of the Plan and that the Disclosure Statement has a number of deficiencies relating to

22 the treatment of Wells Fargo's claim, the Disclosure Statement cannot be approved in its current

23 form.[1]

24

25

26

27

---

28     [1] Throughout the Objection, Wells Fargo has moved certain citations to the footnotes where the insertion of such citations following the text in the main body would have otherwise been distracting.

## 2. **ARGUMENT.**

### A. **Adequacy of a Disclosure Statement.**

The disclosure statement is the Bankruptcy Code's tool to provide creditors with information to decide how to vote on and whether to object to a plan. See Duff v. U.S. Tr. (In re Cal. Fid., Inc.), 198 B.R. 567, 571 (B.A.P. 9th Cir. 1996). Section 1125 of the Code requires that prior to the solicitation of acceptances of a plan, each creditor must receive a disclosure statement that has been approved by the court as containing "adequate information." See 11 U.S.C. § 1125(b). That term has been defined by the Code as follows:

> "adequate information" means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan and in determining whether a disclosure statement provides adequate information, the court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information.

Id. § 1125(a)(1).

The determination of whether a disclosure statement provides "adequate information" is "subjective and made on a case by case basis . . . [and] . . . is largely within the discretion of the bankruptcy court." Tex. Extrusion Corp. v. Lockheed Corp. (In re Tex. Extrusion Corp.), 844 F.2d 1142, 1157 (5th Cir. 1988); accord Menard-Sanford v. Mabey (In re A.H. Robins Co.), 880 F.2d 694, 696 (4th Cir. 1989). Nevertheless, in determining whether the "adequate information" requirements of § 1125(b) have been satisfied, courts frequently investigate whether the disclosure statement before them provides descriptions of the following information:

> (1) the events which led to the filing of a bankruptcy petition;
> (2) a description of the available assets and their value;
> (3) the anticipated future of the company;
> (4) the source of information stated in the disclosure statement;
> (5) a disclaimer;
> (6) the present condition of the debtor while in Chapter 11;
> (7) the scheduled claims;
> (8) the estimated return to creditors under a Chapter 7 liquidation;
> (9) the accounting method utilized to produce financial information and the name of the accountants responsible for such information;

ANGLIN FLEWELLING RASMUSSEN CAMPBELL & TRYTTEN LLP

ANGLIN FLEWELLING RASMUSSEN CAMPBELL & TRYTTEN LLP

1   (10) the future management of the debtor;
    (11) the Chapter 11 plan or a summary thereof;
2   (12) the estimated administrative expenses, including attorneys' and accountants'
    fees;
3   (13) the collectability of accounts receivable;
    (14) financial information, data, valuations or projections relevant to the creditors'
4   decision to accept or reject the Chapter 11 plan;
    (15) information relevant to the risks posed to creditors under the plan;
5   (16) the actual or projected realizable value from recovery of preferential or
    otherwise voidable transfers;
6   (17) litigation likely to arise in a nonbankruptcy context;
    (18) tax attributes of the debtor; and
7   (19) the relationship of the debtor with affiliates.

8   In re Metrocraft Pub. Servs. Inc., 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984). Ultimately, the test

9   is whether "hypothetical reasonable investors receive such information as will enable them to

10  evaluate for themselves what impact the information might have on their claims and on the

11  outcome of the case, and to decide for themselves what course of action to take." In re Applegate

12  Prop., Ltd., 133 B.R. 827, 831 (Bankr. W.D. Tex. 1991).

13          Here, Wells Fargo contends that the Disclosure Statement describing the Plan does not

14  provide adequate information by including little to no information regarding the Debtor's and her

15  family's income for purposes of disclosing feasibility issues and by failing to provide the proper

16  disclosures relating to the treatment of Wells Fargo's claim.

17  **B.      The Disclosure Statement Lacks Adequate Information that Will Allow Creditors to**

18          **Evaluate the Plan's Feasibility.**

19          The Plan proposes that the Debtor will make monthly payments of $17,786.34, which the

20  Debtor contends is feasible based on a monthly gross income of $32,361 derived from a number

21  of sources: (A) $861 from the Debtor's employment at Starbucks, (B) $15,500 from operating

22  her business, Laura Dempsey Design, (C) a $10,000 minimum contribution from her nondebtor

23  spouse, and (D) a $6,000 contribution from her three children.[2] The Debtor is correct when she

24  says that for confirmation, "[t]he issue will remain feasibility."[3] But despite acknowledging this,

25  the Debtor has not presented a disclosure statement that provides sufficient information for

26

27          [2] See Debtor's Combined Plan of Reorganization & Disclosure Statement Dated
    Nov. 4, 2016, at 14, ECF No. 114.

28          [3] Debtor's Status Conference Statement 1:26, ECF No. 126.

creditors to evaluate the feasibility of the Plan. Instead, the Disclosure Statement uses unsupported or unexplained income projections that may just be numbers pulled out of thin air, rather than numbers based on historical figures or some kind of reasonable calculation.

### i.     Inadequate Information Regarding the Debtor's Business Income.

First, the Debtor has not explained why $15,500 is an appropriate estimate for her future monthly business income from operating Laura Dempsey Design when she has not shown such consistent level of income historically. Over the past year, based on the monthly operating reports filed so far,[4] the Debtor has only had one month where her gross income exceeded $15,500,[5] which was December 2015,[6] and three months where her gross income almost reached $15,500 but fell short, which were January, April, and July 2016.[7] In contrast, the Debtor has had five months in which her gross income was drastically lower than $15,500—specifically, March, May, June, August, and September 2016, where her monthly gross income was **$4,820**, **$4,920**, **$9,320**, **$9,520**, and **$3,850**, respectively.[8] And her average monthly gross income over the first 11 months of this case has been roughly **$10,875**,[9] which is around two-thirds of $15,500.

---

[4] Wells Fargo notes that the Debtor has not filed the monthly operating reports for October and November 2016, so the Debtor's financial performance in those two months could not be incorporated into this Objection.

[5] The Debtor's bank statements do not differentiate her income from her Starbucks employment and her income from operating Laura Dempsey Design, so for the sake of this argument, Wells Fargo assumes that the Debtor's gross income derives solely from operating her business.

[6] See Debtor's Dec. 2015 Monthly Operating Report 4–5, ECF No. 39.

[7] See Debtor's Jan. 2016 Monthly Operating Report 4–5, ECF No. 54; Debtor's Apr. 2016 Monthly Operating Report (Part 2 of 3), at 2, ECF No. 99-1; Apr. 2016 Monthly Operating Report (Part 3 of 3), at 1, ECF No. 99-2; Debtor's July 2016 Monthly Operating Report 4–5, ECF No. 108.

[8] See Debtor's Mar. 2016 Monthly Operating Report 4–5, ECF No. 74; Debtor's May 2016 Monthly Operating Report (Part 3 of 4), at 2, ECF No. 100-2; Debtor's May 2016 Monthly Operating Report (Part 4 of 4), at 1, ECF No. 100-3; Debtor's June 2016 Monthly Operating Report (Part 2 of 3), at 2, ECF No. 101-1; Debtor's June 2016 Monthly Operating Report (Part 3 of 3), at 2, ECF No. 101-2; Debtor's Aug. 2016 Monthly Operating Report 4–5, ECF No. 112; Debtor's Sept. 2016 Monthly Operating Report 4–5, ECF No. 113.

[9] After aggregating the gross income figures from the monthly operating reports, the Debtor's overall gross income from November 11, 2015, to September 30, 2016, has been approximately **$119,623**.

ANGLIN FLEWELLING RASMUSSEN CAMPBELL & TRYTTEN LLP

ANGLIN FLEWELLING RASMUSSEN CAMPBELL & TRYTTEN LLP

1    Based on the Debtor's postpetition financial performance, she should not be permitted to

2 simply put down $15,500 as her projected business income and then be done with it. For the next

3 iteration of her Disclosure Statement, the Debtor must either reduce her business income to a

4 more reasonable amount, such as her monthly postpetition average, or the Debtor must

5 thoroughly explain how her circumstances will significantly improve in the near future to justify

6 using the $15,500 figure as her monthly business income.

7    **ii.    Inadequate Information Regarding the Nondebtor Spouse's Income.**

8    The Debtor has also failed to provide adequate information about the income of her

9 spouse, Timothy Gens, who will be contributing at least $10,000 every month to support the

10 Debtor's proposed $17,786.34 plan payments.[10] In order for Timothy Gens to contribute

11 $10,000, he must obviously have $10,000 in disposable income every month, but the Disclosure

12 Statement provides no concrete details regarding the "disclosed" source of his income. Instead,

13 the Debtor makes only a generic reference to a "consulting agreement dated Oct. 15, 2015"

14 (which does not appear to be any of the agreements that Timothy Gens attached to his previously

15 filed declarations) and then states that average monthly income from this consulting position has

16 been $31,387.50 from January to August 2016.[11] Additionally, the Debtor does not even attach a

17 copy of the consulting agreement to the Disclosure Statement.[12] In light of Timothy Gens's prior

18 misrepresentations under penalty of perjury regarding his income, the Disclosure Statement is

19 severely inadequate with regard to Timothy Gens's income.

20    Due to Timothy Gens's lack of credibility, the Debtor should be even more specific, not

21 more vague, when addressing his income in the Disclosure Statement. Here, the limited

22 information in the Disclosure Statement actually does nothing but raise more questions. Who is

23

24

25    [10] See Debtor's Combined Plan of Reorganization & Disclosure Statement Dated Nov. 4, 2016, at 14, ECF No. 114.

26    [11] See id. at 14 n.10.

27    [12] With her previously filed plans, the documentary "evidence" of Timothy Gens's income, although apparently fabricated, at least was part of the record as they were filed as

28 exhibits attached to his declarations. Now, with the current Plan on file, the Debtor has offered nothing besides the words found within the Plan.

ANGLIN FLEWELLING RASMUSSEN CAMPBELL & TRYTTEN LLP

the counterparty to the consulting agreement and why has that identity not been disclosed?[13] What is the duration of the agreement and will it be continuously renewed? Why was this consulting income not a source of income supporting the prior plans? Has the Debtor even seen the consulting agreement or Timothy Gens's bank statements showing $250,000 in deposits over eight months? Or is the Debtor simply taking Timothy Gens's word that this source of income is legitimate? These are all questions that must be addressed by the Debtor if she wishes for her Disclosure Statement to provide adequate information for creditors to evaluate feasibility.

Wells Fargo also takes issue with what appears to be the Debtor improperly dictating what evidence Timothy Gens can produce to establish that his income supporting the Plan is legitimate. Specifically, the Plan provides, "Non filing [sic] spouse is to produce evidence of $90,000 in liquid bank funds earmarked to fund ongoing plan payments to be transferred to debtor's possession as a condition of confirmation of the plan."[14] For the Debtor's own validation, that may be sufficient, but the Debtor cannot limit what evidence she or her spouse presents to the Court. The Debtor will still need to introduce competent evidence that shows Timothy Gens receiving income from his consulting position sufficient to contribute $10,000 each month to the Plan. All that "evidence of $90,000 in liquid bank funds" can demonstrate is that he has possession of $90,000 at this moment. Such evidence does not demonstrate that the Plan can be supported by his consulting income on a continual basis. The Debtor's inclusion of this statement in the Plan seems to be her attempt to excuse Timothy Gens from having to show that his consulting position is real and his income is genuine. The Court should not be deceived

---

[13] The Debtor's recent status report provides that the "Debtor's non-filing spouse's employer will sign a declaration as to debtor's non-filing spouse's income." Debtor's Status Conference Statement 1:27–28, ECF No. 126. If the Debtor will be submitting a declaration from Timothy Gens's employer anyways, then the Debtor should be disclosing the identity of that employer in the Disclosure Statement, rather than making that disclosure in connection with the employer's declaration in support of confirmation. The Debtor's refusal to disclose the employer's identity appears to be yet another attempt to prejudice Wells Fargo's discovery rights during the confirmation proceedings by forcing Wells Fargo to take an additional step (e.g., seeking the employer's identity from discovery propounded on the Debtor or Timothy Gens) before it can seek discovery from that employer.

[14] Debtor's Combined Plan of Reorganization & Disclosure Statement Dated Nov. 4, 2016, at 14 n.10, ECF No. 114.

ANGLIN FLEWELLING RASMUSSEN CAMPBELL & TRYTTEN LLP

1   and should require the Debtor to provide further disclosures regarding Timothy Gens's income.

2       iii.     **Inadequate Information Regarding the Debtor's Children's Financial**

3                **Condition.**

4          The Disclosure Statement is also devoid of any information regarding the Debtor's three

5   children's financial condition, despite the Plan proposing that each child will contribute $2,000

6   every month to support the plan payments.[15] While the Disclosure Statement discloses the

7   children's job or their employer, it offers nothing regarding the children's own financial ability

8   to make the contribution—i.e., their income and expenses. Such information must be disclosed in

9   order for creditors to have adequate information to evaluate the feasibility of the Plan.

10         Wells Fargo notes though that the Debtor likely chose not to directly address her

11  children's income in the Disclosure Statement because they ultimately do not have the income to

12  contribute $2,000 every month. In support of confirmation of the Debtor's prior plan, the Debtor

13  submitted three declarations from each of her children that addressed their employment and

14  compensation. Julia Gens, the older daughter, works for Sephora as an education lead and earns

15  **$3,000** a month <u>before</u> taxes.[16] Eva Gens, the younger daughter, works for the Palo Alto Unified

16  School District as a special education aide and earns **$2,000** a month <u>before</u> taxes.[17] And Henry

17  Gens, the son, works for Catech Inc. as an engineer and earns **$3,800** a month <u>before</u> taxes.[18]

18         For one daughter, Eva Gens, it will be impossible for her to make the proposed $2,000

19  contribution every month because her monthly income <u>after</u> taxes will be below $2,000. For the

20  other two children, Julia Gens and Henry Gens, although their monthly income after taxes is

21  likely to be greater than $2,000, the Debtor has not accounted for these two children's own

22  expenses that may reduce their disposable income to an amount below $2,000. Although the

23  children state that they live with the Debtor, likely eliminating any housing expenses, they most

24  likely have their own personal expenses (e.g., transportation, insurance, food, recreation, etc.)

25

26  ---

    [15] <u>See</u> <u>id.</u> at 14.

27  [16] <u>See</u> Decl. of Eldest Daughter in Supp. of Confirmation ¶¶ 3–4, ECF No. 68-3.

28  [17] <u>See</u> Decl. of Youngest Daughter in Supp. of Confirmation ¶¶ 3–4, ECF No. 68-4.

    [18] <u>See</u> Decl. of Son in Supp. of Confirmation ¶¶ 3–4, ECF No. 68-2.

ANGLIN FLEWELLING RASMUSSEN CAMPBELL & TRYTTEN LLP

that must be disclosed and taken into account for any kind of feasibility analysis. Without the Debtor addressing her children's expenses, creditors do not have an accurate picture of whether the three children have the financial ability to support the Plan.

Additionally, the Debtor's monthly operating reports show that the <u>Debtor</u> had made distributions to <u>all three children</u> during this case. This includes (A) a **$300** check to Henry Gens on or about December 9, 2015,[19] (B) a **$400** check to Julia Gens o or about December 28, 2015,[20] (C) a **$500** check to Julia Gens on or about January 4, 2016,[21] and (D) a **$500** check to Eva Gens on or about January 4, 2016.[22] Such checks further suggest that the three children do not have the financial ability to support the Debtor, rather she must still support them. In light of this, it is necessary for the Debtor to adequately explain in the Disclosure Statement why her three children can reliably contribute $6,000 every month to the Plan.

**C.**     <u>**The Disclosure Statement Lacks Adequate Information Regarding the Treatment of Wells Fargo's Claim.**</u>

Wells Fargo objects to certain disclosures or the lack of disclosures relating to the Plan's treatment of Wells Fargo's claim in the Disclosure Statement, particularly, the proposal to pay Wells Fargo in monthly installments of $9,590.95 over 10 years on account of the $1,115,032.76[23] in prepetition arrears.[24]

First, the Debtor has improperly inserted the following statement in the Disclosure Statement relating to Wells Fargo's claim: "Debtor disputes the mortgage arrears on the mortgage arrears [sic] and disputes that the attorney fees were reasonable or necessary."[25] Such

---

[19] <u>See</u> Dec. 2015 Monthly Operating Report 5, ECF No. 39.

[20] <u>See</u> <u>id.</u>

[21] <u>See</u> Jan. 2016 Monthly Operating Report 5, ECF No. 54.

[22] <u>See</u> <u>id.</u>

[23] The Debtor estimated the prepetition arrears to be $1,150,914.00, but the allowed amount is actually lower.

[24] <u>See</u> Debtor's Combined Plan of Reorganization & Disclosure Statement Dated Nov. 4, 2016, at 2–3, ECF No. 114.

[25] <u>Id.</u> at 2 n.2.

statement should be omitted because the Debtor can no longer dispute such arrears or fees. Her use of "dispute" in the Disclosure Statement suggests that she can still object to Wells Fargo's claims and that its prepetition arrears can be reduced via a successful claim objection. However, that is obviously not the case as the Debtor's objections to Wells Fargo's claims have already been overruled by the Court without her seeking an appeal of the ruling.[26] Unless the Debtor has cause for reconsideration of the allowance of Wells Fargo's claims (which she likely cannot establish as evidenced by her lack of a motion seeking such reconsideration in the four months that have since passed), the amount of Wells Fargo's prepetition arrears and its attorney's fees are now settled and cannot be characterized by the Debtor as still being in dispute.

Second, the Disclosure Statement provides no explanation for why the Debtor believes that the proposed treatment of Wells Fargo's prepetition arrears—i.e., monthly payments over 10 years—is fair and equitable under § 1129(b) of the Bankruptcy Code. As Wells Fargo is likely to vote to reject the Plan as it had done for the prior plan, the Debtor should address the cram down requirements as it applies to Wells Fargo's claim in the revised version of the Disclosure Statement. Other creditors should be made aware of this confirmation-related risk when they read the Plan and the Disclosure Statement. Otherwise, they could be evaluating a plan that has no chance of being confirmed.

**D.**   **The Disclosure Statement Describes a Patently Unconfirmable Plan by Failing to Include Interest on Wells Fargo's Prepetition Arrears.**

Generally, courts do not consider confirmation issues when deciding the adequacy of a disclosure statement under § 1125 of the Bankruptcy Code. However, it is well established that a disclosure statement describing a patently unconfirmable plan cannot be approved as containing adequate information. In other words, "[i]f the disclosure statement describes a plan that is so 'fatally flawed' that confirmation is 'impossible,' the court should exercise its discretion to refuse to consider the adequacy of disclosures." In re E. Me. Electric Coop., Inc., 125 B.R. 329, 333 (Bankr. D. Me. 1991); accord In re Beyond.com Corp., 289 B.R. 138, 140 (Bankr. N.D. Cal.

---

[26] See Order Overruling Objections to Claims of Wells Fargo Bank (Claim Nos. 5 and 6), ECF No. 109.

ANGLIN FLEWELLING RASMUSSEN CAMPBELL & TRYTTEN LLP

ANGLIN FLEWELLING RASMUSSEN CAMPBELL & TRYTTEN LLP

1  2003); In re Main St. AC, Inc., 234 B.R. 771, 775 (Bankr. N.D. Cal. 1999). The purpose of this

2  rule "is to avoid engaging in a wasteful and fruitless exercise of sending the disclosure statement

3  to creditors and soliciting votes on the proposed plan when the plan is unconfirmable on its

4  face." In re Atlanta W. VI, 91 B.R. 620, 622 (Bankr. N.D. Ga. 1988). "Such an exercise in

5  futility only serves to further delay a debtor's attempts to reorganize." Id.

6      Here, the Plan is patently unconfirmable because the proposed treatment of Wells Fargo's

7  claim does not comply with §§ 1123(d) and 1129(a)(1) of the Bankruptcy Code. Specifically, the

8  Debtor's proposed repayment of Wells Fargo's prepetition arrears over 10 years fails to include

9  any interest on such arrears,[27] with the Debtor incorrectly stating that "[t]he note and trust deed is

10  [sic] silent as to whether interest accrues on arrearages."[28]

11      Section 1129(a)(1) of the Code requires that "[t]he plan compl[y] with the applicable

12  provisions of this title." This statutory provision has been interpreted as encompassing the

13  requirements found in §§ 1122 and 1123 of the Code. See Acequia, Inc. v. Clinton (In re

14  Acequia, Inc.), 787 F.2d 1352, 1358 (9th Cir. 1986). One of those requirements is § 1123(d),

15  which provides, "Notwithstanding subsection (a) of this section and sections 506(b), 1129(a)(7),

16  and 1129(b) of this title, if it is proposed in a plan to cure a default the amount necessary to cure

17  the default shall be determined in accordance with the underlying agreement and applicable

18  nonbankruptcy law." 11 U.S.C. § 1123(d).

19      Because the Plan proposes to cure the prepetition default as to Wells Fargo's claim, the

20  amount necessary to cure such default, including any interest, must be determined by the

21  underlying agreement and applicable nonbankruptcy law. Here, the underlying agreements are

22  the note (the "Note"), which expressly allows for interest on the unpaid principal, as well as

23  interest on the unpaid interest, and the deed of trust (the "Deed of Trust"), which expressly

24

25

26

27      [27] See Debtor's Combined Plan of Reorganization & Disclosure Statement Dated
   Nov. 4, 2016, at 2, ECF No. 114.

28      [28] See id. at 2 n.3.

1   allows for interest on Wells Fargo's costs, including attorney's fees.[29] Specifically, section 2(A)

2   of the Note states, "Interest will be charged on unpaid Principal until the full amount of Principal

3   has been paid." That subsection also states, "The interest rate required by this Section 2 is the

4   rate I will pay <u>both before and after any default</u> described in Section 7(B) of this Note," thereby

5   clearly acknowledging that interest will accrue on any defaulted payments under the Note (albeit

6   at the same, rather than an increased, interest rate). Further, the Note contemplates interest on

7   any unpaid interest as evidenced by section 3(E), which provides that any unpaid interest

8   becomes deferred interest and that such deferred interest "will be added to my Principal and <u>will</u>

9   <u>accrue interest at the same rate as the Principal</u>." Additionally, paragraph 7 of the Deed of Trust

10   provides for interest on any unpaid costs, including attorney's fees:

> If: (A) I do not keep my promises and agreements made in this Security
> Instrument, or (B) someone, including me, begins a legal proceeding that may
> significantly affect Lender's rights in the Property (including but not limited to
> any manner of legal proceeding in bankruptcy, in probate, for condemnation or to
> enforce laws or regulations), then <u>Lender may do and pay for whatever it deems</u>
> <u>reasonable or appropriate</u> to protect the Lender's rights in the Property. Lender's
> actions may include, without limitation, appearing in court, <u>paying reasonable</u>
> <u>attorneys' fees</u>, purchasing insurance . . . , and entering on the Property to make
> repairs.
>
> . . .
>
> <u>I will pay to Lender any amounts which Lender advances under this Paragraph 7</u>
> <u>with interest, at the interest rate in effect under the Secured Notes</u>. I will pay those
> amounts to Lender when Lender sends me a notice requesting that I do so. <u>Interest</u>
> <u>on each amount will begin to accrue on the date that the amount is advanced by</u>
> <u>Lender</u>. However, Lender and I may agree in writing to terms that are different
> from those in this Paragraph 7. <u>This Security Instrument will protect Lender in</u>
> <u>case I do not keep this promise to pay those amounts with interest</u>.

21        As itemized in Wells Fargo's opposition to the Debtor's claim objections, Wells Fargo's

22   prepetition arrears are comprised, in part, of **$535,587.96** in unpaid principal and interest,

23   **$44,864.43** in unpaid corporate advances, **$67,776.65** in unpaid "escrow" advances, and

24   **$452,590.96** in unpaid attorney's fees,[30] and Wells Fargo is entitled to interest on account of

---

[29] Copies of the Note and Deed of Trust were attached as **Exhibits 1 and 2** to the previously filed declaration of Jamila Williams, at docket no. 93. For the Court's convenience, copies of the Note and Deed of Trust are attached hereto as **Exhibits A and B**.

[30] <u>See</u> Wells Fargo's Opp'n to Debtor's Objections to Claim No. 5 & Claim No. 7, at 22, ECF No. 88. Wells Fargo concedes that it is not likely entitled to interest on the unpaid late charges of $19,931.54 and that the Debtor should be entitled to credit the $5,718.78 in the

ANGLIN FLEWELLING RASMUSSEN CAMPBELL & TRYTTEN LLP

1   such unpaid amounts in accordance with the Note and Deed of Trust. If the Plan does not provide

2   for interest on these arrears at the rate set forth in the Note and Deed of Trust, then the

3   Disclosure Statement describes a patently unconfirmable plan that fails to comply with

4   §§ 1123(d) and 1129(a)(1) of the Code.

5   **E.      In the Alternative, Wells Fargo Requests a Continuance of the Hearing.**

6          In the alternative, if the Court is not inclined to deny the approval of the Debtor's

7   Disclosure Statement at the January 5, 2017, hearing and is inclined to begin scheduling dates

8   and deadlines for the confirmation hearing on the Plan, Wells Fargo requests that the Court

9   continue the hearing on the Disclosure Statement to a date after **January 25, 2017**,[31] which is

10  when Wells Fargo's motion to dismiss or convert this case is scheduled to be heard.

11         If a confirmation hearing is set by the Court, Wells Fargo intends to begin propounding

12  discovery on the Debtor and third parties (e.g., Timothy Gens and the three children) soon

13  thereafter, which will likely be time-consuming and costly for all parties involved. In the

14  interests of economy, it may be a better course of action to wait and see how the Court will rule

15  on Wells Fargo's motion to dismiss or convert before allowing the confirmation proceedings to

16  move forward. If Wells Fargo's motion is ultimately granted and the case is dismissed or

17  converted, then the parties will have saved a significant amount of time and resources for

18  confirmation- and discovery-related work.

19  **3.      CONCLUSION.**

20         In summary, the Debtor's Disclosure Statement does not contain "adequate information"

21  within the meaning of § 1125 of the Code because the Disclosure Statement includes little to no

22  information regarding the Debtor's and her family's income for purposes of disclosing feasibility

23  issues, fails to provide the proper disclosures relating to the treatment of Wells Fargo's claim,

24

25  _____

26  suspense balance when determining the overall amount of prepetition arrears that accrues
    interest, but Wells Fargo will defer to the Debtor to account for these amounts in any subsequent

27  version of the Plan and Disclosure Statement and will object to an improper calculation, if
    necessary.

28  [31] According to the Court's calendar, the first available hearing date would be
    **February 2, 2017**, at **1:30 p.m.**

and describes a patently unconfirmable plan that does not provide for interest on Wells Fargo's prepetition arrears.

**WHEREFORE**, Wells Fargo respectfully respects that the Court enter an order:

1.      Sustaining Wells Fargo's Objection;

2.      Denying approval of the Debtor's Disclosure Statement; or

3.      In the alternative, continuing the hearing on the approval of the Debtor's Disclosure Statement to a date after **January 25, 2017**; and

4.      Providing for such other and further relief as this Court deems appropriate under the circumstances.

Respectfully submitted,

Dated:  December 29, 2016

ANGLIN, FLEWELLING, RASMUSSEN,
CAMPBELL & TRYTTEN LLP

By:     /s/ Dean G. Rallis Jr.
          Dean G. Rallis Jr.

Attorneys for WELLS FARGO BANK, N.A., as successor by merger with Wells Fargo Bank Southwest, N.A., f/k/a Wachovia Mortgage, FSB, f/k/a World Savings Bank, FSB

# EXHIBIT A

**WORLD SAVINGS BANK, FSB**

# ADJUSTABLE RATE MORTGAGE NOTE

## PICK-A-PAYMENT<sup>sm</sup> LOAN

### CERTIFICATES OF DEPOSIT INDEX

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE, MY MONTHLY PAYMENT AND MY UNPAID PRINCIPAL BALANCE. MY MONTHLY PAYMENT INCREASES, MY INTEREST RATE INCREASES AND MY PRINCIPAL BALANCE INCREASES ARE LIMITED. THIS NOTE IS SECURED BY A SECURITY INSTRUMENT OF THE SAME DATE.

LOAN NUMBER ███2498                    DATE **November 17, 2006**

BORROWER(S)   **LAURA GENS, A MARRIED WOMAN**   sometimes called "Borrower" and sometimes simply called "I" or "me "

PROPERTY ADDRESS  **4141 OLD TRACE RD, PALO ALTO, CA  94306-3728**

**1.  BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U S  **$1,620,000.00** , called "Principal," plus interest, to the order of the Lender  The Lender is **WORLD SAVINGS BANK, FSB, a FEDERAL SAVINGS BANK, ITS SUCCESSORS AND/OR ASSIGNEES**, or anyone to whom this Note is transferred

**2.  INTEREST**

**(A)   Interest Rate**
Interest will be charged on unpaid Principal until the full amount of Principal has been paid   I will pay interest at the yearly rate of **7.347%**  The interest rate I will pay  may change as described in this Section 2  Interest will be charged on the basis of a twelve month year and a thirty day month

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note

**(B)   Interest Change Dates**
The interest rate I will pay may change on the **15th** day of **January, 2007** and on the same day every month thereafter  Each date on which my interest rate could change is called an "Interest Change Date " The new rate of interest will become effective on each Interest Change Date

**(C)   Interest Rate Limit**
My lifetime maximum interest rate limit is **11.950%**, called "Lifetime Rate Cap "

LENDER'S USE ONLY

0 0 1

Case: 15-53562    Doc# 144    Filed: 12/29/16    Entered: 12/29/16 14:00:52    Page 19 of 47

EX2A TO WELLS FARGO'S OBJECTION
PAGE 14

████2498

### (D) Index

Beginning with the first Interest Change Date, my interest rate will be based on an "Index" The Index is the average of the last twelve calendar months' most recently published monthly yields on 3-month certificates of deposit (secondary market) as published by the Federal Reserve Board Lender will calculate the average by adding the twelve most recently published yields together and dividing the result by twelve Lender will round the result of this division to the nearest one-thousandth of one percentage point (0 001%) by using the following convention if the value of the 10,000th place is five or greater, the value of the 1,000th place will round up, if the value of the 10,000th place is less than five, the 1,000th place will not change The most recent Index figure available on each Interest Change Date is called the "Current Index" For purposes of determining the Index, "published" means first made available to the public by the Federal Reserve Board

### (E) Calculation of Interest Rate Changes

Lender will calculate my new interest rate by adding **2.450** percentage points, called the "Margin", to the Current Index Subject to the limit stated in Section 2(C) above, the result of this calculation will be my new interest rate until the next Interest Change Date

If Lender fails to utilize the entire interest rate increase to which it is entitled under this Note on any Interest Change Date by failing to add all or part of the allowable Margin to the Current Index, then Lender may add any such allowable Margin to the Current Index on any future Interest Change Date Lender may not, at a later date, "carryover" or add interest to which it is not entitled under this Note on any Interest Change Date

### (F) Alternative Index

The Lender may choose an alternative index to be the Index if the Index is no longer available For purposes of this Section 2(F), the Index is not "available" if (a) the Index is for any reason no longer published, or (b) the Lender, in its sole discretion, determines that the Index is calculated in a substantially different manner or based on substantially different information than at the time the Index became applicable to this Note, or (c) applicable laws or regulations prevent the Lender from using the Index to calculate interest under this Note The selection of the alternative index shall be at Lender's sole discretion The alternative index may be a national or regional index or another type of index approved by the Lender's primary regulator The Lender will give me notice of the alternative index

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay Principal and interest by making payments every month

I will make my monthly payments on the **15th** day of each month beginning on **January 15, 2007**. I will make these payments every month until I have paid (i) all the Principal and interest, and (ii) any other charges described below that I may owe under this Note, and (iii) any charges that may be due under the Security Instrument If, on **December 15, 2036**, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date "

I will make my monthly payments at **1901 HARRISON STREET, OAKLAND, CALIFORNIA 94612** or at a different place if required by notice from the Lender

### (B) Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U S $ **5,987.84** This amount will change as described in Sections 3(C) and 3(D) below My initial monthly payment amount was selected by me from a range of initial payment amounts approved by Lender and may not be sufficient to pay the entire amount of interest accruing on the unpaid Principal balance

### (C) Payment Change Dates

My monthly payment will change as required by Section 3(D) below beginning on the **15th** day of **January, 2008** and on that day every **12th** month thereafter Each of these dates is called a "Payment Change Date " My monthly payment will also change at any time Section 3(F) or 3(G) below requires me to pay a different amount

I will pay the amount of my new monthly payment each month beginning on each Payment Change Date and as provided in Section 3(F) or 3(G) below

### (D) Calculation of Payment Changes

Subject to Sections 3(F) and 3(G), on the Payment Change Date my monthly payment may be changed to an amount sufficient to pay the unpaid principal balance, including any deferred interest as described in Section 3(E) below, by the Maturity Date However, the amount by which my payment can be increased will not be more than 7-1/2% of the then existing Principal and interest payment This 7-1/2% limitation is called the "Payment Cap " The Lender will perform this Payment Change calculation at least 60 but not more than 90 days before the Payment Change Date

Case: 15-53562   Doc# 144   Filed: 12/29/16   Entered: 12/29/16 14:50:52   Page 20 of 47

EX 2 TO WELLS FARGO'S OBJECTION
PAGE 15

■■■■2498

**(E)    Deferred Interest; Additions to My Unpaid Principal**

From time to time, my monthly payments may be insufficient to pay the total amount of monthly interest that is due  If this occurs, the amount of interest that is not paid each month, called "Deferred Interest," will be added to my Principal and will accrue interest at the same rate as the Principal

**(F)    Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid principal balance can never exceed **125%** of the Principal I originally borrowed, called "Principal Balance Cap " If, as a result of the addition of deferred interest to my unpaid principal balance, the Principal Balance Cap limitation would be exceeded on the date that my monthly payment is due, I will instead pay a new monthly payment  Notwithstanding Sections 3(C) and 3(D) above, I will pay a new monthly payment which is equal to an amount that will be sufficient to repay my then unpaid principal balance in full on the Maturity Date at the interest rate then in effect, in substantially equal payments

**(G)    Payment Cap Limitation; Exceptions**

Beginning with the **10th** Payment Change Date and every 5th Payment Change Date thereafter, my monthly payment will be calculated as described in Section 3(D) above except that the Payment Cap limitation will not apply  Additionally, the Payment Cap limitation will not apply on the final Payment Change Date.

**(H)    Notice of Payment Changes**

The Lender will deliver or mail to me a notice of any changes in the amount of my monthly payment, called "Payment Change Notice," before each Payment Change Date  The Payment Change Notice will include information required by law

**4.   FAILURE TO MAKE ADJUSTMENTS**

If for any reason Lender fails to make an adjustment to the interest rate or payment amount as described in this Note, regardless of any notice requirement, I agree that Lender may, upon discovery of such failure, then make the adjustments as if they had been made on time  I also agree not to hold Lender responsible for any damages to me which may result from Lender's failure to make the adjustment and to let the Lender, at its option, apply any excess monies which I may have paid to partial prepayment of unpaid Principal

**5.   BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of principal at any time before they are due.  A payment of principal before it is due is called a "Prepayment".  When I make a Prepayment, I will tell the Lender in writing that I am doing so.  The Lender may require that any partial prepayments be made on the date my regularly scheduled payments are due. If I make a partial Prepayment, there will be no changes in the due dates or amount of my regularly scheduled payments unless the Lender agrees to those changes in writing.

I may pay Deferred Interest on this Note at any time without charge and such payment will not be considered a "Prepayment" of principal. During the first year of the loan term if I make one or more Prepayments that, in the aggregate, exceed $5,000 in any calendar month, I must pay a prepayment charge equal to 2% of the amount such Prepayments exceed $5,000 in that calendar month.  After the first year of the loan term, I may make a full or partial Prepayment without paying any prepayment charge.

**6.   MAXIMUM LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit, and (ii) any sums already collected from me which exceeded permitted limits will be refunded to me  The Lender may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me  If a refund reduces Principal, the reduction will be treated as a partial Prepayment

**7.   BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A)    Late Charges for Overdue Payments**

If the Lender has not received the full amount of any monthly payment by the end of **15** calendar days after the date it is due, I will pay a late charge to the Lender  The amount of the charge will be **5.00%** of my overdue payment of Principal and interest  I will pay this late charge promptly but only once on each late payment

Case: 15-53562     Doc# 144     Filed: 12/29/16     Entered: 12/29/16 14:00:32     Page 21 of 47

EX-2 TO WELLS FARGO'S OBJECTION
PAGE 16

▮▮▮2498

**(B) Default**

I will be in default if (i) I do not pay the full amount of each monthly payment on the date it is due, or (ii) I fail to perform any of my promises or agreements under this Note or the Security Instrument, or (iii) any statement made in my application for this loan was materially false or misleading or if any statement in my application for this loan was materially false or misleading by reason of my omission of certain facts, or (iv) I have made any other statement to Lender in connection with this loan that is materially false or misleading

**(C) Notice of Default**

If I am in default, the Lender may send me a written notice, called "Notice of Default," telling me that if I do not pay the overdue amount by a certain date, the Lender may require me to pay immediately the amount of Principal which has not been paid and all the interest that I owe on that amount, plus any other amounts due under the Security Instrument

**(D) No Waiver by Lender**

Even if, at a time when I am in default, the Lender does not require me to pay immediately in full as described above, the Lender will still have the right to do so if I am in default at a later time

**(E) Payment of Lender's Costs and Expenses**

The Lender will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law Those expenses may include, for example, reasonable attorneys' fees and court costs

**8. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me or any Borrower at **4141 OLD TRACE RD, PALO ALTO, CA 94306-3728**, or at a single alternative address if I give the Lender notice of my alternative address I may give notice to Lender of a change in my address in writing or by calling Lender's customer service telephone number provided on my billing statement I may designate only one mailing address at a time for notification purposes

Except as permitted above for changes of address, any notice that must be given to the Lender under this Note will be given by mailing it by first class mail to the Lender at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address

**9. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed Any person who takes over these obligations is also obligated to keep all of the promises made in this Note The Lender may enforce its rights under this Note against each person individually or against all of us together This means that any one of us may be required to pay all of the amounts owed under this Note

**10. WAIVERS**

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor "Presentment" means the right to require the Lender to demand payment of amounts due "Notice of Dishonor" means the right to require the Lender to give notice to other persons that amounts due have not been paid

**11. SECURED NOTE - ACCELERATION**

In addition to the protections given to the Lender under this Note, the Security Instrument dated the same date as this Note gives the Lender security against which it may proceed if I do not keep the promises which I made in this Note That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note and includes the following Paragraph 26:

**AGREEMENTS ABOUT LENDER'S RIGHTS IF THE PROPERTY IS SOLD OR TRANSFERRED**

<u>Acceleration of Payment of Sums Secured.</u> Lender may, at its option, require immediate payment in full of all Sums Secured by this Security Instrument if all or any part of the Property, or if any right in the Property, is sold or transferred without Lender's prior written permission Lender also may, at its option, require immediate payment in full if Borrower is not a natural Person and a beneficial interest in Borrower is sold or transferred without Lender's prior written permission However, Lender shall not require immediate payment in full if this is prohibited by Federal Law in effect on the date of the Security Instrument

If Lender exercises the option to require immediate payment in full, Lender will give me notice of acceleration If I fail to pay all Sums Secured by this Security Instrument immediately, Lender may then or thereafter invoke any remedies permitted by this Security Instrument without further notice to or demand on me

■■■■2498

**Exception to Acceleration of Payment of Sums Secured.** If the sale or transfer of all or any part of the Property, or of a beneficial interest in Borrower, if Borrower is not a natural Person, is the first one to occur after the date of this Security Instrument, Lender will not exercise the option to accelerate payment in full of all Sums Secured and the loan may be assumed if

(i)     Lender receives a completed written application from transferee to evaluate the creditworthiness of transferee as if a new loan were being made to the transferee by Lender,

(ii)    Lender approves the creditworthiness of the transferee in writing,

(iii)   transferee makes a cash downpayment sufficient to meet Lender's then current underwriting standards,

(iv)    an assumption fee, in an amount to be determined by Lender (but not to exceed 1% of the balance of Principal and interest due under the Secured Notes at the time of sale or transfer of the Property or of the interest in the Borrower) is paid to Lender, and

(v)     the transferee executes an assumption agreement which is satisfactory to Lender

The loan may be assumed under its then existing terms and conditions with one exception, the Lifetime Rate Cap may be changed  The Lifetime Rate Cap shall be changed to an interest rate which is the sum of the interest rate in effect on the date of a sale or transfer of the Property or beneficial interest in Borrower plus 5 percentage points, if that sum exceeds the Lifetime Rate Cap stated in the Secured Notes

## 12. GOVERNING LAW; SEVERABILITY
This Note shall be governed by and construed under federal law and federal rules and regulations including those for federally chartered savings institutions, called "Federal Law." In the event that any of the terms or provisions of this Note are interpreted or construed by a court of competent jurisdiction to be void, invalid or unenforceable, such decision shall affect only those provisions so construed or interpreted and shall not affect the remaining provisions of this Note

## 13. CLERICAL ERRORS
In the event the Lender at any time discovers that this Note or the Security Instrument or any other document related to this loan, called collectively the "Loan Documents," contains an error which was caused by a clerical mistake, calculation error, computer error, printing error or similar error, I agree, upon notice from the Lender, to reexecute any Loan Documents that are necessary to correct any such error(s) and I also agree that I will not hold the Lender responsible for any damage to me which may result from any such error

## 14. LOST, STOLEN OR MUTILATED DOCUMENTS
If any of the Loan Documents are lost, stolen, mutilated or destroyed and the Lender delivers to me an indemnification in my favor, signed by the Lender, then I will sign and deliver to the Lender a Loan Document identical in form and content which will have the effect of the original for all purposes

## THIS SPACE INTENTIONALLY LEFT BLANK; SIGNATURE PAGE FOLLOWS

Case: 15-53562    Doc# 144    Filed: 12/29/16    Entered: 12/29/16 14:56:52    Page 23 of
47
EX 2 TO WELLS FARGO'S OBJECTION
PAGE 18

**SIGNATURE PAGE**                              ███2498

NOTICE TO BORROWER(S):

BY SIGNING THIS NOTE YOU AGREE TO PAY A PREPAYMENT CHARGE IN CERTAIN CIRCUMSTANCES. PLEASE CAREFULLY READ THIS ENTIRE NOTE (INCLUDING THE PREPAYMENT PROVISION) BEFORE YOU SIGN IT.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED

(PLEASE SIGN YOUR NAME EXACTLY AS IT APPEARS BELOW)

BORROWER(S):

_____ (Seal)
LAURA GENS

EX2A TO WELLS FARGO'S OBJECTION
PAGE 19

# EXHIBIT B

*Financial Title Co*

**RECORDING REQUESTED BY:**
**WORLD SAVINGS BANK**

**WHEN RECORDED MAIL TO:**
**WORLD SAVINGS BANK**
**FINAL DOCUMENTATION**
**CLOSING DEPARTMENT**
**P.O. BOX 659548**
**SAN ANTONIO, TX 78265-9548**

**LOAN NUMBER:** ▉▉▉▉2498

**NOTE AMOUNT: $1,620,000.00**

*escrow # 45062630-595-Jc*

| DOCUMENT: 19202004 | Pages | 20 |
|---|---|---|
| Fees | | 66 00 |
| Taxes | | |
| Copies | | |
| AMT PAID | | 66 00 |

REGINA ALCOMENDRAS     RDE # 007
SANTA CLARA COUNTY RECORDER    11/28/2006
Recorded at the request of     11 32 AM
Recording Service

**FOR RECORDER'S USE ONLY**

# DEED OF TRUST

THIS IS A FIRST DEED OF TRUST WHICH SECURES A NOTE WHICH CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE, FREQUENCY AND AMOUNT OF PAYMENTS AND PRINCIPAL BALANCE (INCLUDING FUTURE ADVANCES AND DEFERRED INTEREST). AT LENDER'S OPTION THE SECURED NOTE MAY BE RENEWED OR RENEGOTIATED. THE SECURED NOTE PROVIDES FOR MONTHLY PAYMENTS OF PRINCIPAL AND INTEREST.

THE MAXIMUM AGGREGATE PRINCIPAL BALANCE SECURED BY THIS DEED OF TRUST IS $2,025,000.00 WHICH IS 125% OF THE ORIGINAL PRINCIPAL NOTE AMOUNT.

I.    **DEFINITIONS OF WORDS USED IN THIS DEED OF TRUST**
     **(A)**   **Security Instrument.** This Deed of Trust, which is dated **November 17, 2006,** will be called the "Security Instrument."

     **(B)**   **Borrower.** LAURA GENS, A MARRIED WOMAN   sometimes will be called "Borrower" and sometimes simply "I" or "me "

**Received**

**DEC 1 5 2006**

**Marlon Lopez**

     **(C)**   **Lender.** WORLD SAVINGS BANK, FSB, ITS SUCCESSORS AND/OR ASSIGNEES, will be called "Lender " Lender is **a FEDERAL SAVINGS BANK,** which is organized and exists under the laws of the United States Lender's address is **1901 Harrison Street, Oakland, CA 94612** .

SD001A (2004-03-3)
DEFERRED INTEREST

CA

Page 1

**LENDER'S USE ONLY**

0 0 3

Case: 15-53562    Doc# 144    Filed: 12/29/16    Entered: 12/29/16 14:00:32    Page 26 of 47

EX2B TO WELLS FARGO'S OBJECTION
PAGE 20

2498

**(D) Note.** The note signed by Borrower and having the same date as this Security Instrument, including all extensions, renewals, substitutions and modifications thereof, will be called the "Note." The Note shows that I owe Lender the original principal amount of U.S. **$1,620,000.00**, plus accrued and deferred interest and such other amounts as stated in the Note I have promised to pay this debt in regularly scheduled periodic payments as provided in the Note and to pay the debt in full by **December 15, 2036** ("Maturity Date").

**(E) Property.** The property that is described below in Section III entitled "Description of the Property" will be called the "Property "

**(F) Sums Secured.** The amounts described below in Section II entitled "Borrower's Transfer of Rights in the Property" sometimes will be called the "Sums Secured."

**(G) Person.** Any person, organization, governmental authority or other party will be called "Person."

**(H) Trustor, Beneficiary, Trustee.** Borrower is the "Trustor," Lender is the "Beneficiary" and **Golden West Savings Association Service Co., A California Corporation** is the "Trustee "

## II. BORROWER'S TRANSFER OF RIGHTS IN THE PROPERTY

I irrevocably grant and convey the Property to the Trustee, in trust for Lender, with a power of sale subject to the terms of this Security Instrument This means that, by signing this Security Instrument, I am giving Lender and Trustee those rights that are stated in this Security Instrument and also those rights that the law gives to lenders who are beneficiaries of a deed of trust and to trustees of a deed of trust. I am giving Lender and Trustee these rights to protect Lender from possible losses that might result if I fail to·

    (i)    pay all amounts owed to Lender under the Note and all other notes secured by this Security Instrument, called the "Secured Notes," including future advances made by Lender and any changes to the Secured Notes made with the written consent of Lender,

    (ii)    pay, with interest, any amounts that Lender spends under Paragraphs 2 and 7 below to protect the value of the Property and Lender's rights in the Property; and

    (iii)    keep all of my other promises and agreements under this Security Instrument, the Secured Notes and any changes to the Secured Notes made with the written consent of Lender.

## III. DESCRIPTION OF THE PROPERTY

I give Trustee rights in the Property described below:

    (i)    The Property which is located at **4141 OLD TRACE RD, PALO ALTO, CA 94306-3728** The legal description of the Property is attached as Exhibit "A" which is made a part of this Security Instrument This Property is called the "Described Property."

    (ii)    All buildings and other improvements that are located on the Described Property;

Case: 15-53562    Doc# 144    Filed: 12/29/16    Entered: 12/29/16 14:00:32    Page 27 of
47

EX2B TO WELLS FARGO'S OBJECTION
PAGE 21

2498

(iii)    All rights in other property that I have as owner of the Described Property. These rights are known as easements, rights and appurtenances attached to the Property,

(iv)    All rents or royalties and other income from the Described Property,

(v)    All mineral, oil and gas rights and profits, water rights and stock that are part of the Described Property,

(vi)    All rights that I have in the land which lies in the streets or roads in front of, behind or next to, the Described Property,

(vii)    All fixtures that are now or in the future will be on the Described Property or on the property described in subsection (ii) of this Section;

(viii)    All of the rights and property described in subsections (ii) through (vii) of this Section that I acquire in the future,

(ix)    All replacements of or additions to the property described in subsections (ii) through (viii) of this Section; and

(x)    All of the amounts that I pay to Lender under Paragraph 2 below.

## IV.    BORROWER'S RIGHT TO GRANT A SECURITY INTEREST IN THE PROPERTY AND BORROWER'S OBLIGATION TO DEFEND OWNERSHIP OF THE PROPERTY

I promise that: (i) I lawfully own the Property, (ii) I have the right to grant and convey the Property to Trustee; and (iii) there are no outstanding claims, charges, liens or encumbrances against the Property, except for those which are of public record.

I give a general warranty of title to Lender This means that I will be fully responsible for any losses which Lender suffers because someone other than myself and the Trustee has some of the rights in the Property which I promise that I have I promise that I will defend my ownership of the Property against any claims of such rights.

### COVENANTS

I promise and I agree with Lender as follows

## 1.    BORROWER'S PROMISE TO PAY

I will pay to Lender, on time, all principal and interest due under the Secured Notes and any prepayment and late charges due under the Secured Notes.

## 2.    PAYMENTS FOR TAXES AND INSURANCE

### (A)    Borrower's Obligations

I will pay all amounts necessary to pay taxes and hazard insurance premiums on the Property as well as assessments, leasehold payments, ground rents or mortgage insurance premiums (if any).

SD001C (2004-03-3)

CA

Case: 15-53562    Doc# 144    Filed: 12/29/16    Entered: 12/29/16 14:00:32    Page 28 of 47

EX2B TO WELLS FARGO'S OBJECTION
PAGE 22

■■■2498

### (B) Escrow Accounts

Subject to applicable law, no escrow shall be required except upon written demand by Lender, in which case, I shall pay to Lender on the day payments are due under the Note, until the Note is paid in full, a sum ("Funds") for (a) yearly taxes, penalties and assessments which may attain priority over this Security Instrument as a lien on the Property; (b) yearly leasehold payments or ground rents on the Property, if any; (c) yearly hazard or property insurance premiums; (d) yearly flood insurance premiums, if any; and (e) yearly mortgage insurance premiums, if any. These items are called "Escrow Items." Lender may, at any time, collect and hold Funds in an amount not to exceed the maximum amount a lender for a federally related mortgage loan may require for an escrow account under the federal Real Estate Settlement Procedures Act of 1974 as amended from time to time, 12 U S.C. § 2601 et seq. ("RESPA"), unless another law that applies to the Funds sets a lesser amount. If so, Lender may, at any time, collect and hold Funds in an amount not to exceed the lesser amount. Lender may estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items in accordance with applicable law

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is such an institution) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items. Lender may not charge me for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays me interest on the Funds and/or applicable law permits Lender to make such a charge. However, Lender may require me to pay a one-time charge for an independent real estate tax reporting service used by Lender in connection with this loan, unless applicable law provides otherwise. Unless an agreement is made or applicable law requires interest to be paid, Lender shall not be required to pay me any interest or earnings on the Funds. Lender shall give to me, without charge, an annual accounting of the Funds, showing credits and debits to the Funds and the purpose for which each debit to the Funds was made The Funds are pledged as additional security for all sums secured by this Security Instrument.

If the Funds held by Lender exceed the amounts permitted to be held by applicable law, Lender shall account to me for the excess Funds in accordance with the requirements of applicable law If the amount of the Funds held by Lender at any time is not sufficient to pay the Escrow Items when due, Lender may so notify me in writing, and, in such case I shall pay to Lender the amount necessary to make up the deficiency or shortage. I shall make up the deficiency or shortage in accordance with the requirements of the Lender, at its sole discretion, in the manner and times prescribed by RESPA

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to me any Funds held by Lender. If, under Paragraph 28, Lender shall acquire or sell the Property, Lender, prior to the acquisition or sale of the Property, shall apply any Funds held by Lender at the time of acquisition or sale as a credit against the sums secured by this Security Instrument.

Case: 15-53562   Doc# 144   Filed: 12/29/16   Entered: 12/29/16 14:00:32   Page 29 of
47

EX2 TO WELLS FARGO'S OBJECTION
PAGE 23

2498

**3. APPLICATION OF BORROWER'S PAYMENTS**

Unless applicable law requires otherwise, Lender will apply each of my payments under the Secured Notes and under Paragraphs 1 and 2 above in the following order and for the following purposes.

First, to pay prepayment charges due under the Secured Notes;

Second, to pay any advances due to Lender under this Security Instrument;

Third, to pay the amounts due to Lender under Paragraph 2 above;

Fourth, to pay interest due under the Secured Notes;

Fifth, to pay deferred interest due under the Secured Notes,

Sixth, to pay principal due under the Secured Notes;

Last, to pay late charges due under the Secured Notes.

**4. BORROWER'S OBLIGATION TO PAY CHARGES, ASSESSMENTS AND CLAIMS**

I will pay all taxes, assessments and any other charges and fines that may be imposed on the Property and that may be superior to this Security Instrument.

I will also make payments due under my lease if I am a tenant on the Property and I will pay ground rents (if any) due on the Property. I will pay these amounts either by making the payments to Lender that are described in Paragraph 2 above or by making the payments on time to the Person owed them.

Any claim, demand or charge that is made against property because an obligation has not been fulfilled is known as a **lien.** I will promptly pay or satisfy all liens against the Property that may be superior to this Security Instrument. However, this Security Instrument does not require me to satisfy a superior lien if: (A) I agree, in writing, to pay the obligation which gave rise to the superior lien and Lender approves in writing the way in which I agree to pay that obligation, or (B) in good faith, I argue or defend against the superior lien in a lawsuit so that, during the lawsuit, the superior lien may not be enforced and no part of the Property must be given up; or (C) I secure from the holder of that other lien an agreement, approved in writing by Lender, that the lien of this Security Instrument is superior to the lien held by that Person. If Lender determines that any part of the Property is subject to a superior lien, Lender may give to me a notice identifying the superior lien. I will pay or satisfy the superior lien or take one or more of the actions set forth above within 10 days of the giving of notice.

**5. BORROWER'S OBLIGATION TO MAINTAIN INSURANCE**

At my sole cost and expense, I will obtain and maintain hazard insurance to cover all buildings and other improvements that now are or in the future will be located on the Property. The insurance must cover loss or damage caused by fire, hazards normally covered by "extended coverage" hazard insurance policies and other hazards for which Lender requires coverage. The insurance must be in the amounts and for the periods of time required by Lender. I may choose the insurance company but my choice is subject to Lender's approval Lender may not refuse to approve my choice unless the refusal is reasonable. All of these insurance policies and renewals of the policies must include what is known as a **Standard Mortgagee Clause** to protect Lender The form of all policies and renewals must be acceptable to Lender. Lender will have the right to hold the policies and renewals. If Lender requires, I will promptly give Lender all receipts of paid premiums and renewal notices that I receive.

SD001E (2004-03-3)

Page 5

CA

Case: 15-53562   Doc# 144   Filed: 12/29/16   Entered: 12/29/16 14:00:32   Page 30 of 47
EX2 TO WELLS FARGO'S OBJECTION PAGE 24

■2498

If I obtain earthquake insurance, any other hazard insurance, credit life and/or disability insurance, or any other insurance on or relating to the Property or the Secured Notes and which are not specifically required by Lender, I will name Lender as loss payee of any proceeds.

If there is a loss or damage to the Property, I will promptly notify the proper insurance company and Lender. If I do not promptly prove to the insurance company that the loss or damage occurred, then Lender may do so.

The amount paid by the insurance company is called "Proceeds." Any Proceeds received will be applied first to reimburse Lender for costs and expenses incurred in connection with obtaining the Proceeds, and then, at Lender's option and in the order and proportion as Lender may determine in its sole and absolute discretion, regardless of any impairment or lack of impairment of security, as follows: (A) to the extent allowed by applicable law, to the Sums Secured in a manner that Lender determines and/or (B) to the payment of costs and expenses of necessary repairs or to the restoration of the Property to a condition satisfactory to Lender, such application to be made in the manner and at the times as determined by Lender

If I abandon the Property or if I do not answer, within 30 days, a notice from Lender or the insurance company stating that the insurance company has offered to settle a claim, Lender may collect the Proceeds. I will notify Lender immediately of any offer to settle a claim I receive from the insurance company. I will immediately deliver any Proceeds I receive from any insurer or other persons to Lender. Lender may use the Proceeds to repair or restore the Property or to pay the Sums Secured. The 30-day period will begin when the notice is given.

If any Proceeds are used to reduce the amount of the outstanding balance of the Sums Secured, that use will not delay the due date or change the amount of any of my regularly scheduled payments under the Secured Notes and under Paragraphs 1 and 2 above. However, Lender and I may agree in writing to delays or changes.

If Lender acquires the Property under Paragraph 28 below, all of my rights in the insurance policies will belong to Lender. Also, all of my rights in any Proceeds which are paid because of damage that occurred before the Property is acquired by Lender or sold will belong to Lender. However, Lender's rights in those Proceeds will not be greater than the total amount of the Sums Secured immediately before the Property is acquired by Lender or sold.

If I am required by Lender to pay premiums for mortgage insurance, I will pay the premiums until the requirement for mortgage insurance ends according to my written agreement with Lender or according to law

## 6.    BORROWER'S OBLIGATION TO MAINTAIN THE PROPERTY AND TO FULFILL ANY LEASE OBLIGATIONS

I will keep the Property in good repair including, but not limited to, keeping the Property free from debris, mold, termites, dry rot and other damaging pests and infestations   I will not destroy or substantially change the Property and I will not allow the Property to deteriorate. I will keep and maintain the Property in compliance with any state or federal health and safety laws, and hazardous materials and hazardous waste laws. I will not use, generate, manufacture or store any hazardous materials or hazardous waste on, under or about the Property   I will indemnify, defend and hold harmless Lender and its employees, officers and directors and their successors from any claims, damages or costs for required or necessary repair or the removal of mold, termites, dry rot, other damaging pests and infestations and hazardous waste or any other hazardous materials claim   If I do not own but am a tenant on the Property, I will fulfill my obligations under my lease. I also agree that, if I acquire the fee title to the Property, my lease interest and the fee title will not merge unless Lender agrees to the merger in writing

Case: 15-53562    Doc# 144    Filed: 12/29/16    Entered: 12/29/16 14:00:32    Page 31 of 47

EX2 TO WELLS FARGO'S OBJECTION
PAGE 25

████2498

## 7.    LENDER'S RIGHT TO PROTECT ITS RIGHTS IN THE PROPERTY

If: (A) I do not keep my promises and agreements made in this Security Instrument, or (B) someone, including me, begins a legal proceeding that may significantly affect Lender's rights in the Property (including but not limited to any manner of legal proceeding in bankruptcy, in probate, for condemnation or to enforce laws or regulations), then Lender may do and pay for whatever it deems reasonable or appropriate to protect the Lender's rights in the Property Lender's actions may include, without limitation, appearing in court, paying reasonable attorneys' fees, purchasing insurance required under Paragraph 5, above (such insurance may cost more and provide less coverage than the insurance I might purchase), and entering on the Property to make repairs. Lender must give me notice before Lender may take any of these actions. Although Lender may take action under this Paragraph 7, Lender does not have to do so. Any action taken by Lender under this Paragraph 7, will not release me from my obligations under this Security Instrument

I will pay to Lender any amounts which Lender advances under this Paragraph 7 with interest, at the interest rate in effect under the Secured Notes. I will pay those amounts to Lender when Lender sends me a notice requesting that I do so. Interest on each amount will begin to accrue on the date that the amount is advanced by Lender. However, Lender and I may agree in writing to terms that are different from those in this Paragraph 7 This Security Instrument will protect Lender in case I do not keep this promise to pay those amounts with interest.

## 8.    LENDER'S RIGHT TO INSPECT THE PROPERTY

Lender, and others authorized by Lender, may enter upon and inspect the Property. They must do so in a reasonable manner and at reasonable times. Before or at the time an inspection is made, Lender must give me notice stating a reasonable purpose for the inspection.

## 9.    AGREEMENTS ABOUT GOVERNMENTAL TAKING OF THE PROPERTY

I assign to Lender all my rights: (A) to proceeds of all awards or claims for damages resulting from condemnation, eminent domain or other governmental taking of all or any part of the Property, and (B) to proceeds from a sale of all or any part of the Property that is made to avoid condemnation, eminent domain or other governmental taking of the Property. All of those proceeds will be paid to Lender. If I receive any such proceeds, I will immediately deliver them to Lender

If all of the Property is taken, the proceeds will be used to reduce the Sums Secured. If any of the proceeds remain after the Sums Secured have been paid in full, the remaining proceeds will be paid to me. Unless Lender and I agree otherwise in writing, if only a part of the Property is taken, Sums Secured will be reduced only by the amount of proceeds multiplied by the following fraction: (A) the total amount of the Sums Secured immediately before the taking, divided by (B) the fair market value of the Property immediately before the taking. The remainder of the proceeds will be paid to me.

If I abandon the Property or if I do not answer, within 30 days, a notice from Lender stating that a governmental authority has offered to make a payment or to settle a claim for damages, Lender has the authority to collect the proceeds and settle the claim Lender may then use the proceeds to reduce the Sums Secured. The 30-day period will begin when the notice is given.

If any proceeds are used to reduce the amount of the outstanding principal of the Secured Notes, that use will not delay the due date or change the amount of any of my regularly scheduled payments under the Secured Notes and under Paragraphs 1 and 2 above. However, Lender and I may agree in writing to delays or changes

Case: 15-53562    Doc# 144    Filed: 12/29/16    Entered: 12/29/16 14:56:32    Page 32 of
47
EX2 TO WELLS FARGO'S OBJECTION
PAGE 26

2498

## 10. CONTINUATION OF BORROWER'S OBLIGATIONS AND OF LENDER'S RIGHTS

### (A) Borrower's Obligations

Lender may allow a Person who takes over my rights and obligations subject to this Security Instrument to delay or to change the amount of the payments of principal and interest due under the Secured Notes or under this Security Instrument. Even if Lender does this, however, that Person and I will both still be fully obligated under the Secured Notes and under this Security Instrument

Lender may allow those delays or changes for a Person who takes over my rights and obligations, even if Lender is requested not to do so. Lender will not be required to bring a lawsuit against such a Person for not fulfilling obligations under the Secured Notes or under this Security Instrument, even if Lender is requested to do so.

### (B) Lender's Rights

Even if Lender does not exercise or enforce any of its rights under this Security Instrument or under the law, Lender will still have all of those rights and may exercise and enforce them in the future. Even if Lender obtains insurance, pays taxes, or pays other claims, charges or liens against the Property, Lender will have the right under Paragraph 28 below to demand that I make immediate payment in full of the Sums Secured

## 11. OBLIGATIONS OF BORROWER, CO-SIGNORS AND OF PERSONS TAKING OVER BORROWER'S RIGHTS OR OBLIGATIONS

Except as provided below, if more than one Person signs this Security Instrument as Borrower, each of us is fully obligated to keep all of Borrower's promises and obligations contained in this Security Instrument Lender may enforce Lender's rights under this Security Instrument against each of us individually or against all of us together. This means that any one of us may be required to pay all of the Sums Secured.

Any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signor") (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signor's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument, and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signor's consent.

Any Person who takes over my rights or obligations under this Security Instrument will have all of my rights and will be obligated to keep all of my promises and agreements made in this Security Instrument. Similarly, any Person who takes over Lender's rights or obligations under this Security Instrument will have all of Lender's rights and will be obligated to keep all of Lender's agreements made in this Security Instrument.

## 12. MAXIMUM LOAN CHARGES

If the loan secured by this Security Instrument is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed permitted limits, then: (A) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limits and (B) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower Lender may choose to make this refund by reducing the outstanding principal balance of the Secured Notes or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge under the Secured Notes

SD001H (2004-03-3)

CA

EX2 TO WELLS FARGO'S OBJECTION
PAGE 27

■■■■ 2498

### 13. LEGISLATION AFFECTING LENDER'S RIGHTS

If a change in applicable law would make any provision of the Secured Notes or this Security Instrument unenforceable, Lender may require that I make immediate payment in full of all Sums Secured by this Security Instrument.

### 14. NOTICES REQUIRED UNDER THIS SECURITY INSTRUMENT

Any notice that must be given to me under this Security Instrument will be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice will be addressed to me at **4141 OLD TRACE RD, PALO ALTO, CA 94306-3728**. A notice will be given to me at an alternative address if I give Lender notice of my alternative address. I may give notice to Lender of my alternative address in writing or by calling Lender's customer service telephone number provided on my billing statement. I may designate only one mailing address at a time for notification purposes. Except as permitted above for changes of address, any notice that must be given to Lender under this Security Instrument will be given by mailing it by first class mail to Lender's address stated in Section I (C) above entitled, "Definitions of Words Used In This Deed of Trust," unless Lender gives me notice of a different address. Any notice required by this Security Instrument is given when it is mailed or when it is delivered according to the requirements of this Paragraph 14 or of applicable law.

### 15. GOVERNING LAW; SEVERABILITY

**This Security Instrument and the Secured Notes shall be governed by and construed under federal law and federal rules and regulations, including those for federally chartered savings institutions ("Federal Law") and, to the extent Federal Law does not apply, by the law of the jurisdiction in which the Property is located.** In the event that any of the terms or provisions of this Security Instrument or the Secured Notes are interpreted or construed by a court of competent jurisdiction to be void, invalid or unenforceable, such decision shall affect only those provisions so construed or interpreted and shall not affect the remaining provisions of this Security Instrument or the Secured Notes.

### 16. BORROWER'S COPY

I acknowledge the receipt of one conformed copy of the Secured Notes and of this Security Instrument.

### 17. LENDER'S RIGHTS TO RENTAL PAYMENTS AND TO TAKE POSSESSION OF THE PROPERTY

If Lender requires immediate payment in full or if I abandon the Property, then Lender, Persons authorized by Lender, or a receiver appointed by a court at Lender's request may: (A) collect the rental payments, including overdue rental payments, directly from the tenants; (B) enter upon and take possession of the Property; (C) manage the Property; and (D) sign, cancel and change rental agreements and leases. If Lender notifies the tenants that Lender has the right to collect rental payments directly from them under this Paragraph 17, I agree that the tenants may make those rental payments to Lender without having to ask (i) Lender whether I have failed to keep my promises and agreements under this Security Instrument, or (ii) me for my permission to do so.

If Lender acts to have the Property sold after a Breach of Duty as defined in Paragraph 28, I understand and agree that: (A) my right to occupy the Property ceases at the time the Property is sold, (B) I shall have no right to occupy the Property after such sale without the written consent of the new owner of the Property, and (C) my wrongful and unlawful possession of the Property may subject me to monetary damages, including the loss of reasonable rent and the cost of eviction. All rental payments collected by

SD001i (2004-03-3)

CA

Case: 15-53562   Doc# 144   Filed: 12/29/16   Entered: 12/29/16 14:00:32   Page 34 of 47

EXB TO WELLS FARGO'S OBJECTION PAGE 28

2498

Lender or by a receiver, other than the rent paid by me under this Paragraph 17, will be used first to pay the costs of collecting rental payments and of managing the Property If any part of the rental payments remains after those costs have been paid in full, the remaining part will be used to reduce the Sums Secured. The costs of managing the Property may include the receiver's fees, reasonable attorneys' fees and the costs of any necessary bonds.

**18.     INJURY TO PROPERTY; ASSIGNMENT OF RIGHTS**

An assignment is a transfer of rights to another. I may have rights to bring legal action against persons, other than Lender, for injury or damage to the Property or in connection with the loan made to me by Lender and which arose or will arise before or after the date of this Security Instrument These rights to bring legal action may include but are not limited to an action for breach of contract, fraud, concealment of a material fact, or for intentional or negligent acts. I assign these rights, and any and all proceeds arising from these rights, as permitted by applicable law, to Lender. Lender may, at its option, enforce these rights in its own name and may apply any proceeds resulting from this assignment to the Sum Secured and this Security Instrument after deducting any expenses, including attorneys' fees, incurred in enforcing these rights. At the request of Lender, I will sign any further assignments or other documents that may be necessary to enforce this assignment. I will notify Lender immediately if I believe I have the right to bring any such legal action against any persons, and will notify Lender immediately if I assert any claim or demand against or commence any legal action against any such person. If I receive any proceeds from any persons besides Lender in connection with any such claim, demand or legal action, I will immediately deliver such proceeds to Lender.

**19.     CLERICAL ERRORS**

In the event Lender at any time discovers that this Security Instrument, the Secured Notes or any other document related to this loan, called collectively the "Loan Documents," contains an error which was caused by a clerical mistake, calculation error, computer error, printing error or similar error, I agree, upon notice from Lender, to execute such documentation as Lender deems necessary to correct any such error(s) and I also agree that I will not hold Lender responsible for any damage to me which may result from any such error.

**20.     LOST, STOLEN OR MUTILATED DOCUMENTS**

If any of the Loan Documents are lost, stolen, mutilated or destroyed and Lender delivers to me an indemnification in my favor, signed by Lender, then I will sign and deliver to Lender a Loan Document identical in form and content which will have the effect of the original for all purposes

**21.     WAIVER OF STATUTE OF LIMITATIONS**

I will waive, within applicable law, the pleading of the statute of limitations as a defense to enforce this Security Instrument, including any obligations referred to in this Security Instrument or Secured Notes.

**22.     CAPTIONS**

The captions and headings at the beginning of each paragraph of this Security Instrument are for reference only and will not be used in the interpretation of any provision of this Security Instrument.

**23.     MODIFICATION**

This Security Instrument may be modified or amended only by an agreement in writing signed by Borrower and Lender.

**24.     CONDOMINIUM, COOPERATIVE AND PLANNED UNIT DEVELOPMENT OBLIGATIONS**

If the Property is a unit in a condominium, cooperative or planned unit development, each of which shall be called the "Project," and I have an interest in the common elements of the Project, then Lender and I agree that:

(A)     If an owners association or other entity, called "Owners Association," holds title to Property for the benefit or use of the Project and its members or shareholders, the Property also includes my interest in the Owners Association and the uses, proceeds and benefits of my interest.

SD001J (2004-03-3)

CA

Case: 15-53562   Doc# 144   Filed: 12/29/16   Entered: 12/29/16 14:36:32   Page 35 of
47

EX２P TO WELLS FARGO'S OBJECTION
PAGE 29

2498

    **(B)**    The following are called the "Constituent Documents:" (i) The declaration or any other document which created the Project, (ii) By-laws of the Owners Association; (iii) Code of regulations for the Project, (iv) Articles of incorporation, trust instrument or equivalent document which creates the Owners Association; (v) The Project's covenants, conditions and restrictions; (vi) Other equivalent documents.

    I shall perform all of my obligations under the Constituent Documents, including my obligation to pay, when due, all dues and assessments If I do not pay the dues and assessments when due, Lender may, at its option, pay them. I will pay to Lender any amounts which Lender advances under this Paragraph 24 according to the terms described in Paragraph 7 above.

    **(C)**    If the Owners Association maintains, with an insurance company reasonably acceptable to Lender, a **master** or **blanket** policy on the Project which is satisfactory to Lender and which provides insurance coverage on the terms, in the amounts, for the periods, and against the hazards Lender requires, including fire and hazards included within the term "extended coverage," and Lender is provided with evidence of such **master** or **blanket** policy, then: (i) Lender waives the provision in Paragraph 2(B) above for the payment to Lender of the estimated yearly premium installments for hazard insurance on the Property; and (ii) hazard insurance coverage on the Property as required by Paragraph 5 above is deemed to be satisfied to the extent that the required coverage is provided by the Owners Association policy. I shall give Lender prompt notice of any lapse in the required hazard insurance coverage. I shall provide a copy of such **master** or **blanket** policy to Lender annually.

    In the event of a distribution of any hazard insurance proceeds, including without limitation any earthquake or special hazards insurance whether or not such coverage was required by Lender, in lieu of restoration or repair following a loss to the Property, whether to the unit or to common elements, any proceeds payable to me are hereby assigned and shall be paid to Lender for application to the Sums Secured by this Security Instrument, with any excess paid to me. If I receive any such proceeds, I will immediately deliver them to Lender or otherwise apply them as set forth above.

    I shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable to Lender in form, amount and extent of coverage.

    **(D)**    I shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the Project, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of condemnation, eminent domain or other governmental taking, (ii) any amendment to any provision of Constituent Documents unless the provision is for the express benefit of Lender or of lenders generally; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the **master** or **blanket** hazard insurance policy and/or the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**25.**    **FUTURE ADVANCES**

    At Borrower's request, Lender, at its option (but before release of this Security Instrument or the full reconveyance of the Property described in the Security Instrument) may lend future advances, with interest, to Borrower Such future advances, with interest, will then be additional Sums Secured under this Security Instrument.

SD001K (2004-03-3)

CA

Case: 15-53562   Doc# 144   Filed: 12/29/16   Entered: 12/29/16 14:00:32   Page 36 of 47

EXP TO WELLS FARGO'S OBJECTION
PAGE 30

**2498**

## 26. AGREEMENTS ABOUT LENDER'S RIGHTS IF THE PROPERTY IS SOLD OR TRANSFERRED

**Acceleration of Payment of Sums Secured.** Lender may, at its option, require immediate payment in full of all Sums Secured by this Security Instrument if all or any part of the Property, or if any right in the Property, is sold or transferred without Lender's prior written permission. Lender also may, at its option, require immediate payment in full if Borrower is not a natural Person and a beneficial interest in Borrower is sold or transferred without Lender's prior written permission. However, Lender shall not require immediate payment in full if this is prohibited by Federal Law in effect on the date of the Security Instrument.

If Lender exercises the option to require immediate payment in full, Lender will give me notice of acceleration. If I fail to pay all Sums Secured by this Security Instrument immediately, Lender may then or thereafter invoke any remedies permitted by this Security Instrument without further notice to or demand on me.

**Exception to Acceleration of Payment of Sums Secured.** If the sale or transfer of all or any part of the Property, or of a beneficial interest in Borrower, if Borrower is not a natural Person, is the first one to occur after the date of this Security Instrument, Lender will not exercise the option to accelerate payment in full of all Sums Secured and the loan may be assumed if:

(i)     Lender receives a completed written application from transferee to evaluate the creditworthiness of transferee as if a new loan were being made to the transferee by Lender;

(ii)     Lender approves the creditworthiness of the transferee in writing;

(iii)     transferee makes a cash downpayment sufficient to meet Lender's then current underwriting standards;

(iv)     an assumption fee, in an amount to be determined by Lender (but not to exceed 1% of the then outstanding balance of Principal and interest under the Secured Notes at the time of sale or transfer of the Property or of the interest in the Borrower) is paid to Lender; and

(v)     the transferee executes an assumption agreement which is satisfactory to Lender  Such assumption agreement may provide, if required by Lender, that the transferee open a deposit account with Lender or with a bank or other depository institution approved by Lender, to facilitate direct payments if direct payments are required in the Note

The loan may be assumed under its then existing terms and conditions with one exception, the Lifetime Rate Cap may be changed. The Lifetime Rate Cap shall be changed to an interest rate which is the sum of the interest rate in effect on the date of a sale or transfer of the Property or beneficial interest in Borrower plus 5 percentage points, if that sum exceeds the Lifetime Rate Cap stated in the Secured Notes.

## 27. SUBSTITUTION OF TRUSTEE

I agree that Lender may at any time appoint a successor trustee and that Person shall become the Trustee under this Security Instrument as if originally named as Trustee.

Case: 15-53562   Doc# 144   Filed: 12/29/16   Entered: 12/29/16 14:00:32   Page 37 of
47

EX2 TO WELLS FARGO'S OBJECTION
PAGE 31

2498

## 28. RIGHTS OF THE LENDER IF THERE IS A BREACH OF DUTY

It will be called a "Breach of Duty" if (i) I do not pay the full amount of each regularly scheduled payment on the date it is due, or (ii) I fail to perform any of my promises or agreements under the Note or this Security Instrument; or (iii) any statement made in my application for this loan was materially false or misleading or if any statement in my application for this loan was materially false or misleading by reason of my omission of certain facts; or (iv) I have made any other statement to Lender in connection with this loan that is materially false or misleading If there is a Breach of Duty by me, Lender may demand an immediate payment of all sums secured.

If there is a Breach of Duty by me, Lender may exercise the power of sale, take action to have the Property sold under applicable law, and invoke such other remedies as may be permitted under any applicable law.

Lender does not have to give me notice of a Breach of Duty. If Lender does not make a demand for full payment of the Sums Secured upon a Breach of Duty, Lender may make a demand for full payment of the Sums Secured upon any other Breach of Duty

If there is a Breach of Duty, Lender may also take action to have a receiver appointed to collect rents from any tenants on the Property and to manage the Property The action to appoint a receiver may be taken without prior notice to me and regardless of the value of the Property.

The sale of the Property may be postponed by or at the direction of Lender. If the Property is sold, I agree that it may be sold in one parcel. I also agree that Lender may add to the amount that I owe to Lender all legal fees, costs, allowances, and disbursements incurred as a result of the action to sell the Property.

Lender will apply the proceeds from the sale of the Property in the following order: (A) to all fees, expenses and costs incurred in connection with the sale, including but not limited to trustees' and attorneys' fees, if any; (B) to all Sums Secured by this Security Instrument, and (C) any excess to the Person or Persons legally entitled to it

## 29. RECONVEYANCE

Upon payment of all Sums Secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all Secured Notes to Trustee. Trustee shall reconvey the Property without warranty to Borrower. Lender may charge Borrower a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (including the Trustee) for services rendered and the charging of the fee is permitted, whether expressly or by lack of express prohibition, under applicable law If the fee charged does not exceed any maximum fee set by applicable law, the fee is conclusively presumed to be reasonable.

## 30. STATEMENT OF OBLIGATION

Lender may collect a fee of $60.00, or such greater maximum amount as may from time to time be allowed by law, for furnishing any statement of obligation with respect to this Security Instrument or the Secured Notes.

SD001M (2004-03-3)

CA

Case: 15-53562   Doc# 144   Filed: 12/29/16   Entered: 12/29/16 14:00:32   Page 38 of
47
EXB2 TO WELLS FARGO'S OBJECTION
PAGE 32

2498

**31.    ( X )   QUICK QUALIFYING LOAN PROGRAM**

I have qualified for this loan by making statements of fact which were relied upon by Lender to approve the loan rapidly. This loan is called a "Quick Qualifying Loan." I have stated and I confirm that. (A) I do not have any other Quick Qualifying Loans with Lender; (B) I have agreed to not further encumber the Property and do not intend to further encumber the Property for at least six months after the date of the Secured Notes and this Security Instrument; and (C) If I am purchasing the Property, all of the terms of the purchase agreement submitted to Lender are true and the entire down payment is cash from my own funds.

If any of the statements of fact that I have made are materially false or misleading, I will be in default under the Secured Notes and this Security Instrument. If I am in such default, Lender may, at its option, increase the interest rate and margin subject to the Lifetime Rate Cap stated in the Secured Notes

**32.    ( X )   OWNER OCCUPANCY**

Lender has relied upon statements of fact which I have made to qualify for this loan  I have stated and confirm that· (A) the Property is my personal and primary residence, (B) I will occupy the Property not later than 30 days after this Security Instrument is recorded; and (C) I will use the Property as my residence for at least 12 months from the date this Security Instrument is recorded

If any of the statements of fact that I have made are materially false or misleading, I will be in default under the Secured Notes and this Security Instrument  If I am in such default, Lender may, at its option, increase the interest rate and margin, subject to the Lifetime Rate Cap stated in the Secured Notes

**( X )   VALUE INDICATES THAT THE PARAGRAPH APPLIES.**

**THIS SPACE INTENTIONALLY LEFT BLANK; SIGNATURE PAGE FOLLOWS.**

Case: 15-53562    Doc# 144    Filed: 12/29/16    Entered: 12/29/16 14:00:52    Page 39 of 47

EX2B TO WELLS FARGO'S OBJECTION
PAGE 33

2498

**BY SIGNING BELOW,** I accept and agree to the promises and agreements contained in this Security Instrument and in any rider(s) signed by me and recorded in proper official records.

**(PLEASE SIGN YOUR NAME EXACTLY AS IT APPEARS BELOW)**

**BORROWER(S):**

_____ (Seal)

LAURA GENS

**ATTACH INDIVIDUAL NOTARY ACKNOWLEDGEMENT**

SD001 (2004-03-1)        [AF1 (2004-03-1)]                    Page 15                                    **CA**
                         [B01 (2004-03-1)]

EX2 TO WELLS FARGO'S OBJECTION
PAGE 34

STATE OF CALIFORNIA                    } ss:

COUNTY OF San Mateo County

On November    , 2006 _____, before me, Jose A. Chacon _____, Notary Public, personally appeared

Laura Gens _____

Personally known to me (or proved to me on the basis of satisfactory
evidence) to be the person(s) whose name(s) is/are subscribed to the
within instrument and acknowledged to me that he/she/they executed
the same in his/her/their authorized capacity(ies), and that by
his/her/their signature(s) on the instrument the person(s), or the entity
upon behalf of which the person(s) acted, executed the instrument

WITNESS my hand and official seal

Signature _____

| FOR NOTARY SEAL OR STAMP |
| --- |
| JOSE A. CHACON<br>Commission # 1604663<br>Notary Public - California<br>Alameda County<br>My Comm. Expires Sep 5, 2009 |

EX2B TO WELLS FARGO'S OBJECTION
PAGE 35

■■■2498

**BORROWER(S)' SPOUSE(S) OR DOMESTIC PARTNER(S):** The undersigned hereby joins in this Security Instrument for the sole purpose of encumbering, subordinating, conveying and/or waiving any current or potential interest in the Property. By signing below, the undersigned encumbers, subordinates, conveys and/or waives any and all rights, interests or claims in the Property, including, but not limited to, homestead, dower, marital or joint-occupancy rights. No personal liability under the Note is hereby incurred by the undersigned joining spouse or domestic partner.

**BORROWER(S)' SPOUSE(S) OR DOMESTIC PARTNER(S):**

_____ (Seal)

_____ (Seal)

_____ (Seal)

**ATTACH INDIVIDUAL NOTARY ACKNOWLEDGEMENT**

SD001 (2004-03-1)                               Page 16                               **CA**

[AL1 (2004-03-1)]

EX. B TO WELLS FARGO'S OBJECTION PAGE 36

STATE OF CALIFORNIA      } ss·

COUNTY OF San Mateo County

On November 19, 2006 _____, before me, Jose A. Chacon _____, Notary Public, personally appeared

Timothy Gens

~~Personally known to me~~ (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument

WITNESS my hand and official seal

Signature _____

| FOR NOTARY SEAL OR STAMP |
| --- |
| **JOSE A. CHACON**<br>Commission # 1604663<br>Notary Public - California<br>Alameda County<br>My Comm. Expires Sep 5, 2009 |

45062630 -595 -JC1

Legal Description

All that certain real property situated in the City of Palo Alto, County of Santa Clara, State of California, described as follows

Beginning at a point in the Northwesterly line of that certain 2 9586 acre parcel of land conveyed by Deed from Edith C Eaton and Marjorie L Eaton, to Edward J. Demson and Ruth E. Demeon, his wife, dated December 16, 1946 and recorded December 20, 1946 in Book 14098 of Official Records, Page 421, distant thereon S 42° 28' 40" W 359 65 feet from the intersection thereof with the Westerly line of the subdivision of the Mesa Tract, the Map of which was filed for record in Book "I" of Maps, Page 123, Santa Clara County Records, said point of beginning also being the most Westerly corner of the said 2 9586 acre parcel of land; thence S 42° 28' 40" W along the Southwesterly prolongation of the said Northwesterly line of said 2 9586 acre parcel of land 49.80 feet to the most Southerly corner of that certain 0.0566 acre parcel of land conveyed by Edith C Eaton and Marjorie L Eaton to George A Forrester and Julia M Forrester, his wife, by Deed dated May 17, 1954, and recorded May 20, 1954 in Book 2677 of Official Records, Page 436, thence along the Southwesterly line of said last mentioned parcel of land N. 42° 19' 20" W. 224 80 feet, more or less, to the Southeasterly line of that certain Right-of-Way 16 feet wide, known as Eaton Way; thence along said last mentioned line N 45° 20' E 162 00 feet and N 37° E 38 45 feet, thence leaving said line of the Right of Way 16 feet wide, S 42° 19' 40" E 220 389 feet, more or less, to the said Northwesterly line of the 2 9586 acre parcel of land, thence along said last mentioned line S 42° 28' 40" W. 150 69 feet to the point of beginning and being a portion of the original Lot 7 of the Briones Partition or segregation of the Northern portion of the Rancho La Purissima Concepcion, according to the map of the same, a certified copy of which map is of record in the office of the recorder of the County of Santa Clara, State of California in Book "I" of Maps, Page 149

Excepting there from that portion condemned for road purposes by instrument recorded on August 22, 1969, in Book 8648 of Official Records, Page 217, and being described as follows

EX2 TO WELLS FARGO'S OBJECTION
PAGE 38

Beginning at the most Southerly point of that certain 0 0566 acre parcel of land conveyed by Edith C Eaton and Marjorie L Eaton and to George A. Forrester and Julia M. Forrester, his wife, by Deed dated May 17, 1954, and recorded May 20, 1954 in Book 2877 of Official Records, at Page 436, Official Records of the Recorder of Santa Clara County, State of California, thence along to the Southwesterly line of said parcel, N 42° 19' 20" W 224 80 feet, thence along the Northwesterly line of said parcel, N 45° 20' E 23.69 feet, thence Southerly along the arc of a tangent curve to the left, having a radius of 20 feet, through a central angle of 87° 34' 40" for an arc distance of 30 57 feet to a point of tangency, thence from said point of tangency, parallel with said Southwesterly line S 42° 19' 20" W. 127 70 feet, thence Southeasterly along the arc of a tangent curve to the left, having a radius of 175 feet, through a central angle of 25° 46' 25" for an arc distance of 78 72 feet to a point on the Southeasterly line of that parcel, thence S 42° 28' 40" W. along said Southeasterly line 21.99 feet to the point of beginning, being a portion of the original Lot 7 of the Briones Partition for Segregation of the Northern portion of the Rancho La Purissima Concepcion, a Map of which was recorded in the office of the County Recorder of the County of Santa Clara, State of California on November 3, 1900 in Book 1 of Maps, at Page 149

175-20-054

ANGLIN FLEWELLING RASMUSSEN CAMPBELL & TRYTTEN LLP

# CERTIFICATE OF SERVICE

I, the undersigned, declare that I am over the age of 18 and am not a party to this action. I am employed in the City of Pasadena, California; my business address is Anglin, Flewelling, Rasmussen, Campbell & Trytten LLP, 301 N. Lake Ave., Suite 1100, Pasadena, California 91101-4158.

On the date below, I served the within following document(s) entitled:

**WELLS FARGO'S OBJECTION TO APPROVAL OF THE DISCLOSURE STATEMENT ASPECT OF DEBTOR'S COMBINED PLAN OF REORGANIZATION AND DISCLOSURE STATEMENT DATED NOV. 4, 2016**

on all interested parties in said case addressed as follows:

**Served By Means Other than Electronically Via the Court's CM/ECF System**

*Chambers Copies to Hon. Stephen L. Johnson*

Hon. Stephen L. Johnson
United States Courthouse, Room 3035
280 South First Street
San Jose, California 95113-3099
(408) 278-7515

☒ **BY OVERNIGHT MAIL SERVICE:** I am readily familiar with the firm's practice of collection and processing of correspondence by Golden State Delivery Services. Under that same practice it would be deposited on today's date in a GSO collection receptacle at Pasadena, California, for delivery within 48 hours, with instructions to bill sender on the label.

**Served Electronically Via the Court's CM/ECF System**

| *Attorneys for Debtor* | *Office of the U.S. Trustee* |
|---|---|
| Lars T. Fuller, Esq. | U.S. Trustee |
| Saman Taherian, Esq. | Office of the U.S. Trustee / SJ |
| THE FULLER LAW FIRM | U.S. Federal Building |
| 60 N. Keeble Avenue | 280 S. 1st St., Suite 268 |
| San Jose, CA 95126 | San Jose, CA 95113-3004 |
| Fullerlawfirmecf@aol.com | USTPRegion17.SJ.ECF@usdoj.gov |

*Attorneys for the U.S. Trustee*

U.S. Office of the U.S. Trustee
1301 Clay Street
Oakland, CA 94612
(510) 637-3210
lynette.c.kelly@usdoj.gov
ustpregion17.oa.ecf@usdoj.gov

95451/000264/01628139-1

1

1

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  I declare that I am employed in the office of a member of the Bar of this Court, at whose direction the service was made.  This declaration is executed in Pasadena, California on December 29, 2016.

2

3

4

Malinda S. Sinclair

*/s/ Malinda S. Sinclair*

5

(Type or Print Name)

(Signature of Declarant)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ANGLIN FLEWELLING RASMUSSEN CAMPBELL & TRYTTEN LLP